We will hear argument first this morning in number 161053, Chengzhou Trina or This appeal concerns the issue of causation in the trade remedy investigation. That is how the International Trade Commission meets its statutory requirement. I'll ask you to speak up a bit, please. I'm sorry, certainly. It's funny, my wife usually tells me the opposite. How the ITC meets its statutory obligation to determine whether injury suffered by the domestic industry, assuming it exists, is by reason of subject imports. I think it may be helpful to look at this in two steps. First, whether the factual conditions in the current case require the sort of causation analysis described by the court in some of the past cases like Gerald Meadows, Brodsky, and Mittal. And second, if the answer to that question is yes, then whether or not the commission in fact engaged in that type of analysis. So I was struck, I guess, by a series of Supreme Court cases, Gross against Financial Somebody and Burrage against United States, in which the Supreme Court has said now repeatedly that the phrase by reason of has a very clear default meaning, which requires at least but for causation. So if we start there, I don't see anything actually contrary in our earlier precedence. So why, if one starts there, did the commission not find that, regardless of the particular words, have sufficient evidence to support that finding? Well, that's interesting. Obviously, we didn't brief the Supreme Court cases, but they sound, and I'm not familiar with them. They're just follow-ons to Price Waterhouse, which had a series of non-majority opinions. But now they say the phrase by reason of requires at least a showing of but for causation. Full stop. Right. That's interesting. In the trade context, these cases have never gone that far, if you will. They've never said that the but for analysis, I'm sorry, that the by reason of phrase compels a but for analysis. Right. But the trade cases, unless there's something in the statute to the contrary, presumably need to follow what the Supreme Court says, that phrase as a background. Right. Well, I would agree that, in fact, that is a helpful background, obviously, for my view in that. So why did what the commission find here, either in terms of missing findings or missing evidence that would support findings, why is there an insufficiency on the assumption that but for causation, in fact, had to be found? Well, a but for analysis requires a certain sort of hypothetical view of the world. I think that is a fundamental aspect of what a but for analysis is. In other words, what would the world have looked like but for the existence of subject imports? That's the inquiry one would have to undertake. And the commission, we submit, did not do that. Well, it didn't do it in terms, but that's just a different way of phrasing a proposition. When I look at the other adversely, the other factors in evidence that adversely affected the domestic solar panel industry, they don't fully account for what happened to them. With respect to that, though, I do not think that that sort of logic can be gleaned from the commission's decision in this case. In other words, in this case, the commission said, you know, there's a big factual record. There's a lot of things going on here. But critically, you've got this impetus toward grid parity. You've got an overriding competitive factor, which we have been arguing, if you remove the subject imports, you have to look and see, if you remove the subject imports, whether or not that injury would have still occurred. That is the essence, I would say, of a but for analysis in this context. Now, there may be some cases where you don't have to do that. In other words, you only have two places. Well, in other words, does but for, but for in some areas, tort law and others, has a specific meaning and is intended to do a certain thing. We have a statutory requirement for what the commission has to do. And there's nothing in the statute that says but for. What we have is cases that talk about it. And some of them seem to use but for in the technical meaning. You've got to do the hypothetical. Some of them seem to use it differently, meaning you've got to do an analysis showing that you know what the world would have looked like, but you can do it without using magic words. I agree. What is the law in this particular area and in this particular case? That's the question. Right. I agree one obviously does not have to use magic words, and the swift train precedent is the most obvious on that. But recall that in the swift train case, the Court of International Trade did remand the case to the commission to perform some form of but for analysis, which hadn't been done in the first instance by the agency. And, of course, the court said it couldn't do it. But the CIT opinion in this case is really exhaustive and careful on that whole issue and took each one of the questions that your side had raised and analyzed it and showed how the commission had dealt with it. And the CIT judge pretty much does a but for analysis only without using the magic words. What's wrong with that? With due respect, I don't think he did. I respect Judge Eaton a great deal. But what they did there was the traditional sort of reviewing, going through the factors in the statute in a jumble, if you will, of three things. Domestic industry, subject imports, and this impetus to grid parity. In other words, a competition from natural gas. They acknowledged that the natural gas was there, but the commission simply said, we don't see it as a justification for underselling. And they made very short shrift of what we think is a fundamental issue. And the fact is that if grid parity really did exist in this situation, which is undisputed, well, let me back up. In a way, it's a critical finding, a condition of competition finding by the commission that there was this overriding competitive factor, the impetus to grid parity. You do not get that in a lot of these types of trade cases where there is a critical third element. That was what started the line of cases in Gerald Metals, and it continues through. And even Swift Trade obviously didn't repudiate that, not that a panel could. So we have a situation where you know there is an overriding competitive factor that must be considered, or else you're going to be attributing injury to a subject. Which was the overriding competitive factor in this case from your viewpoint? The impetus toward grid parity, the competition by natural gas generating technologies. They set the low price everybody was striving to get to. And technological advancements and these federal government incentives helped close the gap. If the grid parity theory meant that gas prices, falling gas prices were driving down the price for and then therefore demand for CSVP products, isn't it true though that the market for CSVP products went up dramatically during the period? Yes. Well, yes, but that is not a contradiction. Why isn't it that according to your grid parity theme, the demand, the market for CSVP products should have logically shrunk rather than expanded as it did? It expanded for several exogenous reasons. You had the federal and state mandates. You had improving technology that did enable the prices to decline. You had the crash in polysilicon costs that enabled to some degree the prices of solar energy to decline. And you generally had a social awareness starting in 2009, 2010 that solar power, renewable energy was the wave of the future. So then why would the falling gas prices be an overriding factor if the market for CSVP products seemed to be pretty robust? It was growing. Because it always – the record is clear on this and the ITC found it as well. They were always chasing the price of natural gas. They were successful to some extent. But if prices were – if you were to remove subject imports, you would still have this drive down of prices toward the grid parity level, toward the level set by natural gas. In the United States, that is the ultimate determinant of what the prices are going to be. That is a default determinant of prices in the United States. You remove subject merchandise, you still have that drive toward grid parity. Counsel, I get the feeling that what you'd like us to do is reweigh the evidence, particularly on the effect of natural gas on the industry. But that's not our job. That's the commission's job. Our job is to determine whether they properly looked at that factor and whether there's substantial evidence in the record to support their conclusion. Let me read to you what the CIT said about it. As shall be seen, the commission informed its analysis by evaluating a number of conditions of competition present in the U.S. CSPV market and the role that each played during the POI with respect to the injuries sustained by the domestic CSPV industry. One, the emergence of alternative energy technologies such as the increased supply and declining price of natural gas. Two, the declining cost of polysilicon, et cetera. The judge, and I've looked both at what the judge said and at what the commission said, I think he accurately describes what the commission did. He did. He did. And we're not going to sit here and ask, did the commission get it right? That's not our question. I am not asking you to do that. I'm going to be very clear. We are not asking this court to rewrite the evidence. We are not. What we are asking you to do is to reconfirm the legal structure of analysis in cases such as Gerald Meadows and Brodsky. Are you asking us to require that the commission have done a, quote, but for analysis which requires, in the technical sense, which requires the hypothetical situation without the accused, et cetera, in this case? Is that what you're asking for? Okay, two points. No, but it would be nice. And what I mean by that is... But that's the commission's choice. Right, exactly. What I mean by that is that in Swift Train there was a remand, and apparently it did not follow the full hypothetical but-for structure, and there was an appeal to this court on that issue, and this court said we aren't... We don't do nice. What is it that you want us to do? What I want you to do is remand with the request or instruction that the commission engage in some form of but-for analysis. One can't look at what they've done, never mind what the CIT says. You can't look at what the commission has done and say they engaged in a form of but-for analysis, especially according to what the Supreme Court said. You can say they've done the traditional analysis, which is looking, grinding through the factors to determine volume, price, and impact, and all that. But you can't say, I submit, that what they have done is a but-for analysis. I'm sorry. I'd like to have a minute for... You've used all but one minute of your rebuttal, but why don't we hear from the other side? We'll restore your full five minutes of rebuttal. Thank you. Thank you. Ms. Alvis. Good morning. May it please the Court, my name is Mary Jane Alvis, and I represent the U.S. International Trade Commission. As you've recognized, in this case, the commission unanimously determined that the domestic industry was materially injured by the reason of significant and increasing volume of CSPB products. Does the commission dispute the proposition from the Supreme Court that the phrase by reason of requires at least a showing of but-for causation? The commission believes that, in this case, we have performed a but-for analysis. Can you answer my question, not just say that if such a requirement exists, which you want to reserve, you met it? Yes, to our knowledge, that is what the Supreme Court has said. The Supreme Court cases, as counsel has indicated, were not subject to much discussion in this case, although they had been in the Swift train case. Speak up a little. Yes, Your Honor. The Supreme Court's cases had not been under discussion in this case, although they had been in the underlying Swift train case. We do recognize that a but-for analysis is required. However, this court has also provided substantial guidance what a but-for analysis means in the context of this statutory framework. And I think that's the point that we'd like to emphasize this morning, what exactly that means. So are you saying that this court has articulated a conception of but-for that's different from the conception of but-for that's been expressed by the Supreme Court for other cases, other statutes that use this phrase by reason of? Well, for example, Your Honor, this court has emphasized in Swift train that there is no magic words test. This court has also reiterated in Swift train and in prior cases that what the statute requires here is that the subject imports contribute more than minimally or tangentially to the injury. That's only a floor. That's certainly not sufficient. Correct. And in addition, Your Honor, this court has emphasized, for example, in Mittal, that what it is looking for is for the commission to focus on the cause of the injury and to provide full consideration to the causation issue and provide a meaningful explanation of its conclusions supported by evidence in the record. I can refer you there to the court's decisions in Mittal on pages 873, 875 to 879, and then also the court's decision in Swift train at 1359 to 1360. These are the same concepts that also appeared in this court's decision in Gerald Mittal's. So now I guess I would be interested in your going to what you started to answer when I asked my first question. Why did the commission, in what it said, adequately address but-for causation? Because the commission fully— By which I mean that the domestic industry would not have been materially in the same sorry state had it not been for the imports. That's what but-for causation means. Correct, Your Honor. So the commission went through each of the statutory factors, volume, price, and impact. It also considered within the context of each of these statutory factors other factors that may have been injuring the domestic industry. As you recognize this morning, the Court of International Trade reviewed the commission's discussions of each of these other factors significantly, substantially. Not only the factors that—the three factors that are in dispute here, grid parity, utilities, and incentive programs, but the court also looked at other factors that the commission discussed in its opinion, including non-subject imports and declining polysilicon costs. The commission, however, provided an extensive discussion with respect to each of these factors. And the bottom line here was with respect to each of these arguments, the record simply did not support a lot of the assumptions underlying the appellant's arguments. For example, with respect to utilities. They argued that the domestic industry was unable or unwilling to compete for sales to utilities and that any increase in subject imports merely involved sales to utilities. In fact, the record reflected and the commission stated that the domestic industry and subject producers both made quality products that were highly substitutable. They both provide similar product technologies and products of particular wattages or cell type or size were not limited to specific market segments. In other words, the domestic industry made sales throughout the U.S. market in all of the various segments to utilities, to residential, for commercial uses, but it lost market share to subject imports in each of these segments. In addition, the commission also fully addressed Chinese respondents' claims about incentives. Can I ask you this question? I don't remember the details here at all. I had a vague recollection that part of, this is a two and a half year period of investigation, right? It was for the period of January 2009 through June of 2012, so three and a half years. Three and a half years, and a lot can change during that period. Suppose that Mr. Ellis' picture of the world was right for the last six months and on a going forward basis would be expected to be correct, but wrong for the first three years so that for the whole period of investigation, it's wrong, but not for the last bit and for going forward. What does the statute say the commission is to do if that were the hypothesis? The commission makes its determination as of vote day, but it is looking at the information throughout the entire period of investigation. In this case, the commission made a finding of present material injury, and so it was not projecting forward whether or not there would be a threat of material injury in the imminent future. Is the present material injury based on the determination about the three and a half year period as a whole or what it was in June of 2012, the end of it? The commission's determination is based on the entire period, taking into consideration what the current data also show. For example, if there is a sea change and there's a big difference at the end of the period, then certainly the commission would need to explain any such change. That wasn't the case here. In this particular case, for example, with respect to government incentives, one of the arguments that respondents make is that government incentives were declining. In fact, the commission's record reflected that throughout the entire period of investigation, there was a very favorable overall mix of incentives from federal government, state governments, and local incentives. Moreover, Chinese respondents focus on the expiration of a particular program, the Federal Section 1603 program. They argue that this program expired during the period of investigation. In fact, it wasn't supposed to expire until the last six months of the period of investigation, and it continued to have positive effects on demand in the U.S. market even after its expiration because in this case, for example, utilities were allowed to start production or start assembly of their projects so long as their projects were completed by 2016. So the effects of that program continued to have effects long after the end of the period of investigation. Moreover, as the commission recognized, demand continued to increase throughout this period. So there wasn't a situation like that characterized by the Chinese respondents where the demand was in fact declining and or that government incentive programs were declining. And in addition, you've also heard their arguments this morning about whether or not the commission fully considered their grid parity claims. Again, as you heard, due to declines in the cost of natural gas-generated electricity really related to the increased hydraulic shale drilling in the United States, they argued that any lost sales or lower prices were due to competition with natural gas and not subject imports. Again, their arguments lacked factual support in the record. As I mentioned, the record showed a very favorable overall mix of incentives. As they acknowledged this morning, the cost of the main raw material to produce these products, polysilicon, had declined. Therefore, CSPV products, as you recognized, Judge Chen, this morning, were actually very competitive, even with respect to products such as natural gas. And the record showed that CSPV demand was explosive during this period. Indeed, when we surveyed questionnaire respondents about the role that demand for conventional energy products played relative to demand for CSPV products, the majority of them either responded that changes in the price of other electricity sources had no change in their demand for CSPV products or it actually increased their demand for CSPV products. So again, as you correctly asked this morning, aren't respondents actually asking you to reweigh the evidence? The commission did acknowledge that there were other factors that collectively exerted downward pressure on prices, but it reasonably found that subject imports, which were substantial in the market and growing and competing throughout the market, were a, quote, significant cause of the decline in the prices of CSPV products during the period of investigation. Just for your information, you've just begun to eat into your friend's time. Thank you. You and he can work that out. I don't want to do that. Your Honor, if you have further questions, I'd be happy to answer them. Otherwise, let me yield my time. Thank you. Thank you, Your Honor. May it please the Court. I thought I would start by addressing the questions that you asked, and I think the questions on causation are extremely important. Also, the question regarding grid parity. On causation, both the commission and the Court of International Trade provided more than sufficient analysis on this point. As you know from this Court's own rulings, the by reason of standard requires a showing that subject imports are more than a minimal or tangential cause of injury. That's not all it requires. That's like the two-sentence statement about substantial evidence in the old Supreme Court case that say it's more than a scintilla, which is true, but doesn't begin to say what it is. What it is is actually something higher, which is reasonable. Correct. Yes, and also the Statement of Administrative Action states that the commission has to examine factors other than subject imports, including things like non-subject imports. To find that in the absence of the subject imports, the domestic industry would not have been in the same state. Correct. And in this case. That is but for causation. Correct. And as the government stated, there's no specific words. The commission has a great deal of flexibility in terms of how it approaches this standard here by reviewing volume, price, impact of imports, and the alternative causes it did conduct that required analysis. What do you think is the state of this court's case law in this area on by reason of and causation? Do you think that we've already articulated some kind of delta between but for causation and our expectation for causation in a conventional kind of case, as opposed to some special circumstance like a fungible commodity case? Well, more broadly, I don't think there's a delta between what courts have held in other areas of law versus international trade law. I think this court has just provided guidance for when the commission does this very complex causation analysis, what are the factors it has to look at and the alternatives it has to consider. Now, there is the line of BRATS and Mital tests, a very limited exception. Of course, BRATS stands for the prospect that if the dumped product is a commodity product and thus there are non-subject imports present, then the commission has to determine whether subject imports would simply be replaced by non-subject imports. But what these respondents, the Chinese respondents, are asking for is much different. An expansion of the test, not to say that solar panels are a commodity because they're clearly not, but that the electricity that they produce is a commodity. And therefore, what the respondents are arguing is that because of things other than solar panels, natural gas, oil, nuclear power can be used to generate electricity, the commission had to look at whether the domestic industry would have been better off absent the subject imports. They did look at that. Let me just tell you what's confusing me. I don't understand why you say the BRATS-Mital line of cases is somehow narrow. It simply articulates that when there are real-world facts in the market that affect but for causation, the commission has to address them. And that's equally true regardless of whether it's a commodity or whether it's anything else. The state of the real-world facts simply may differ. I don't understand why you think there's a doctrinal difference. Well, Your Honor, If there's nothing to address outside the subject merchandise, because there's no market effect of something outside the subject merchandise, well, then there's nothing to address. Your Honor, I agree with that. But I would say that the initial cases involved a clear situation of a commodity product that would therefore be replaced by non-subject imports. But I agree that the commission has to look at the entire landscape. It has to look at the other causes of injury. And it certainly did so here. With respect to grid parity, it focused on this quite clearly in its analysis to say, the impetus toward grid parity failed to explain the significant underselling by subject imports. So it completely looked at that factor and looked at how demand for solar products increased as natural gas prices declined, as Your Honor pointed out, demonstrating that those factors were decoupled. So the evidence here was overwhelming. There was compelling factual evidence, and the analysis was also correct. Thank you, Your Honors. Thank you. Mr. Ellis, you have five minutes. Mr. Ellis, let me ask you this question. In the hypothetical but full world, we would take out the accused product and look at the world as it is. Let's assume the commission had done that, articulated it that way. They looked at the grid. They looked at competing industries, gas and so on. And they looked at the products that were in the market, et cetera. What is it that you think they would have added to their analysis had they done a spelled out technical but for analysis? What aspect or what factors would now appear that they didn't look at? It would simply be a two-way analysis, competitive analysis of domestic industry, CSPV industry and the grid and natural gas-based energy. The question is, would the U.S. industry have been any better off if subject imports did not exist? Yes, I understand that's the but for a question. But that would have been – But when you make that analysis, what are you going to look at? You would look at the same types of things but not through the prism of how are subject imports behaving. What are subject imports doing? You don't care anymore. They're gone. So you have to look at what would the economic conditions of the U.S. industry have been like in the absence of subject imports. What was left out of their analysis the way they did it? They didn't do that at all. They simply said, here's a lot of things that the subject merchandise imports are doing that are bad. They're lower prices. That's not all they said. They said, let's look at what the effect of changes in government regulations were. They looked at the question of what was the downturn in natural gas, what effect did that have? They looked at all of that, and then they factored it all together to decide whether ultimately the industry was injured in regard to the subject imports. Right. What's wrong with that? Because they didn't – if one wants to do a full formal but for analysis, there are econometric ways that you can delete a certain mass of data and say what would the world have looked like in the absence of that data. Is that what you're arguing for? I'm not saying that's compulsory. That is what, in answering your question, that is what this sort of analysis could look like. But why – it seems to me you've just identified one possible form of concrete evidence, and why isn't the right response to that is every single piece of evidence that you submitted in support of your proposition that your imports were not what, in fact, caused all of the suffering of the domestic industry. They addressed every bit of it. Well, the examples they gave, by the way, about – in answering this question – the answers they gave about how grid parity interacted with – or how subject imports interacted with grid parity were conclusory and minimal. They just said that the drive to grid parity does not explain the underselling. But they don't explain it. They don't say why. It's just said. And the other thing that they talk about is that demand went up anyway, as I discussed with Judge Chen. There are reasons why demand could have been going up. So there really isn't a discussion – let me put it this way. There are many, many facts in this record. But there is not an analysis of what the industry – how the industry would have fared in the absence of subject imports. Well, the ultimate question is causation, right? That's the ultimate question. And in any complex set of circumstances, it's difficult to say what is coincidence and what is causation. There's no formula for doing that. It's a question of judgment. It's a question of assessment. Am I wrong about that? Well, there are formulas, in fact, if one wants to engage in them. But in any event, even if it's a question of judgment, it has to be applied pursuant to a legal rule that will get you a meaningful result. And here we just have a lot of facts that are put through the filter of the statute. The legal rule according to the statute is by reason of. What's wrong with that? Nothing. But how do you articulate, how do you apply those three words? The court has said, this court has said repeatedly, that there is something called a but-for analysis. And going back to your question to other counsel, the court seems to have articulated a view that there are, in fact, different levels or different mechanisms by which the by reason of standard is applied in a regular case versus a case that has the triggering conditions identified in Mittal and Brodsky. And we think that the commission itself in this case has found the fundamental factual point that is that triggering mechanism requiring more of a but-for analysis than just grinding through the facts.